O

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

|  |  |
|---|---|
| U.S. COMMODITIES FUTURES TRADING COMMISSION, | Case No.: SACV 10-01876 DOC(RNBx) |
| Plaintiff, | |
| vs. | |
| | ORDER GRANTING IN PART MOTION FOR SUMMARY JUDGMENT [257] [269] |
| AMERICAN BULLION EXCHANGE ABEX CORP., ET AL., | |
| Defendants. | |

Before the Court is the motion for summary judgment (Dkt. 257) filed by Plaintiff United States Commodity Futures Trading Commission ("CFTC") against Defendant Ryan A. Nassbridges and Relief Defendants. After considering the moving and opposing papers, the entirety of the record, and oral argument, the Court GRANTS IN PART and DENIES IN PART the motion.

## I.    Background

The CFTC brought the instant lawsuit against defendants Ryan A. Nassbridges, American Bullion Exchange ABEX Corp. ("ABEX Corp."), and American Bullion Exchange, LLC ("ABEX LLC") (together, "ABEX" or "ABEX entities").  *See* Compl. at 1-2.  The CFTC also named Relief Defendants American Preferred Commodities APC Corp. ("APC"), R.E. Lloyd Commodities Group Holding LLC ("R.E. Lloyd"), and Bita J. Nassbridges, wife of Ryan A. Nassbridges.  *Id.*

The CFTC alleges that Mr. Nassbridges, as President and CEO of ABEX Corp. and president of ABEX LLC, ran both companies and exercised control over their regular operations.  The CFTC claims that Mr. Nassbridges held the companies out as coin and bullion trading businesses, but then commingled investor funds and invested a substantial portion of those funds in high-risk options and futures contracts instead.  The CFTC further alleges that Mr. Nassbridges sustained an overall net trading loss of roughly $2.2 million in investor funds through his futures and options trading.  Mr. Nassbridges also allegedly misappropriated client funds by funneling roughly $2.5 million of those funds into his and his wife's personal bank accounts and the bank accounts of relief defendants R.E. Lloyd and APC.

The CFTC filed the instant complaint on December 8, 2010.  *See* Compl. (Dkt. 1).  The CFTC brings claims for violations of the Commodity Exchange Act and associated regulations as follows: (1) violation of 7 U.S.C. §§ 6b(a)(2)(i) and (iii): fraud by solicitation, misappropriation and failure to disclose trading and losses (futures) (count 1); (2) violation of 7 U.S.C. § 6c(b) and regulations 33.10(a) and (c), 17 C.F.R. §§ 133.10(a) and (c): fraud by fraudulent solicitation, misappropriation and failure to disclose trading and losses (options) (count 2); (3) violation of section 7 U.S.C. § 6*o*(1), fraud as a CPO and associated person (count 3); (4) violation of 7 U.S.C. § 6(m)(l) and 17 U.S.C. § 13c(b), violation of 7 U.S.C. 6k2, failure to register as an associated person and a commodity pool operator (count 4); (5) violation of Regulation 4.20(a)(1), 17 C.F.R. § 4.20(a)(1), CPO accepting pool funds other than in the name of the pool and failure to treat the pool as a separate legal entity (count 5); (6) violation of Regulation 4.21, 17 C.F.R. § 4.21(a)(1), failure to provide pool disclosure documents (count 6); (7) violation of Regulation 4.22, 17 C.F.R. § 4.22, failure to provide monthly account statements

(count 7); and (8) disgorgement of funds from the relief defendants (count 8).  *See generally* Compl.

### a.  Investor Testimony

The CFTC presents the testimony of two investors: Henry Gindt and the Murrays.  Mr. Gindt testified in his deposition that he invested in ABEX in September 2007 after speaking by phone with ABEX employee Curtis Lund and Mr. Nassbridges.  Gindt Dep. at 5.  Mr. Gindt invested $1.4 million with ABEX on the understanding that Mr. Nassbridges was investing in gold bullion, platinum, and palladium, and that Mr. Nassbridges had a seat on the Commodities Exchange.  *Id*. at 10.  Mr. Gindt testified that Mr. Nassbridges discussed gold bullion investments with him and did not mention futures or options.  *Id*. at 6-7, 12-13.  Mr. Gindt testified that he would not have invested with ABEX if he had known the investment would be in futures or options.  *Id*. at 7.  Mr. Gindt received statements from ABEX stating that trades were being conducted in bullion and coins.  *Id*. at 12.  Mr. Nassbridges told Mr. Gindt that Mr. Gindt's investment funds would be maintained in a segregated account, that the investments were insured by Lloyd's of London, and that Mr. Nassbridges would use stop-loss orders to protect investors from any loss of principle.  *Id*. at 13.

Arla Jeanne Murray testified in her deposition that she and her husband spoke to Curtis Lund by phone and received two ABEX brochures in the mail.  Murray Dep. at 9.  In September 2007, Ms. Murray and her husband spoke over the phone with Mr. Nassbridges.  Mr. Nassbridges represented to the Murrays:

> That he was the president of ABEX and an experienced gold bullion dealer; he was registered with the Chicago Board of Trade and the National Futures Association; ABEX would use our money to buy gold bullion at spot prices; our money would be separately accounted for and segregated from other customers' money; our money would be kept in the United States; our money would not be commingled with other persons or accounts; our money would not be used to secure or extend credit of any customer or person; we could pay in full and take immediate physical delivery of the gold bullion or store our metal with HSBC

> Bank or an independent depository; we could finance our purchase through ABEX
>
> with a  down payment . . . [A]nd ABEX's investments were insured against loss
>
> by Lloyd's of London.

*Id*. at 11-12.  Ms. Murray understood Mr. Nassbridges's representations to mean that "the Nassbridges through ABEX would purchase and store gold bullion for our account."  *Id*. at 13.  The Murrays ordered gold bullion bars and coins through ABEX, and sold coins as well.  ABEX sent the Murrays month-end statements from November 2007 until April 2008 that showed balances in quantities of gold bullion bars and the "current gross equity" of the account at the time.  *See id*. Exs. 9-14.  ABEX did not provide any account statements showing the futures and options trading of the funds.  *Id*. at 22.  The Murrays paid ABEX a total of $1,531,523.  *Id*. at 23.  The Murrays filed an adversary proceeding in the Nassbridges' 2008 bankruptcy proceeding and won a $1.5 million judgment after the bankruptcy court found that Mr. Nassbridges had defrauded them.  *Id*. at 28.

### b.  Employee Testimony

Curtis Lund worked for ABEX as an account representative.  Lund Dep. (Mot. Ex. D) at 11.  Mr. Lund testified that Mr. Nassbridges controlled ABEX's marketing materials and solicitation practices, including writing the handbook sent to investors.  Mr. Lund testified that the content of the ABEX solicitation materials included representations that: (1) ABEX would invest customers' funds in bullion and coins; (2) customers' funds would be maintained in segregated accounts; (3) ABEX's investments were insured against loss by Lloyd's of London; (4) ABEX would use stop-loss orders to protect customers from any loss of their principal; and (5) Mr. Nassbridges was registered with the National Futures Association.  *Id*. at 17-18.  In soliciting customers, ABEX disclosed neither that customer funds would be used to trade commodity futures and options, nor the risks associated with the trading.  *Id*. at 19-20.  Mr. Nassbridges conducted all trades, and Mr. Lund and the other employees were not allowed to observe or listen in on the trade calls with the exchanges.  *Id*. at 19.

### c.  Trading Accounts

Although he did not represent to customers that ABEX invested funds in futures and options, Mr. Nassbridges opened and maintained five commodity futures and options trading accounts in his name, his wife's name, or ABEX Corp.'s name at two Futures Commission Merchants ("FCMs").  Bougas Decl. ¶¶ 2, 48-55, 66.  Ryan Nassbridges held at least three accounts in his name at MF Global and Vision: a Vision account ending -6623 opened in July 2006, *see id.* Exs. 5-A, 5-B, an MF Global account ending in -6623 opened in December 2006[1], and a Vision account ending -0855, *see id.* Exs. 7-A, 7-B.  MF Global also had at least one trading account open in Bita Nassbridges's name, opened in October 2007, ending -8501.  *See id.* Exs. 8-A, 8-B.  Mr. Nassbridges also opened an account for ABEX with MF Global in October 2007, account number ending -8506.  *See id.* Exs. 9-A, 9-B.  All of these accounts traded futures or options between August 2006 and March 2008.  *See id.* Exs. 5-B, 6-B, 7-B, 8-B, 9-B; Castellano Dep. at 26-28.

Employees of the FCMs testified that the accounts at issue traded only futures and options, and that Mr. Nassbridges seemed entirely aware of that.  First, all of the trading employees spoke to Mr. Nassbridges about futures and trading in his accounts.  Mr. Castellano, a broker for MF Global, spoke to Mr. Nassbridges about placing orders and margin calls on the various accounts at MF Global.  Castellano Dep. at 12, 39.  Josh Lewis discussed margin calls with Mr. Nassbridges, and how various global issues might affect the price of gold.  Lewis Dep. at 23.  Mr. Lewis testified that these conversations only addressed futures trading and futures markets, as the conversations dealt with COMEX and the futures exchange in Chicago.  *Id.* at 23.  Joseph Texido, a Senior Vice President with MF Global, was the primary contact at MF Global for the accounts opened for Mr. Nassbridges, Bita Nassbridges, and ABEX.  Texido Dep. at 18-19.  Mr. Texido believed Mr. Nassbridges was fully aware that he was trading futures, as

---

[1] It appears that these two accounts may actually be the result of an account transfer from Vision to MF Global, and so reflect one account that was opened with Vision and later transferred to MF Global.  *See* Lewis Dep. at 23; Texido Dep. at 31; 2009 R. Nassbridges Dep. at 179.  Therefore, the two -6623 accounts are better thought of as the same account.

he referred to the trades as "contracts", and did not use language that would have made any sense for the buying and selling of physical bullion (which would require buying actual quantities, not contracts). *Id*. at 24.

Trading employees also stated that the account statements for Mr. Nassbridges's various accounts showed futures and options trading, not spot metals trading. Castellano Dep. at 27, 40, 45-46, 74; Texido Dep. at 49. The trading employees testified that Mr. Nassbridges had full control of all of these accounts, and personally traded in them regularly. Lewis Dep. at 22, 24, 26, 29-30; Texido Dep. at 20, 24. During the one-month period from August 2007 to September 2007, Mr. Texido had trading authority for one of the Nassbridges accounts. Texido Dep. at 21, Ex. A; Bougas Decl. Ex. 5-A. Other than that brief period, Mr. Nassbridges fully controlled the accounts and the trading employees did not have power of attorney to make trades or the electronic login information for the accounts. Castellano Dep. at 44-45; Silverstein Dep. at 43; Texido Dep. at 49; *see* Lewis Dep. at 22, 24, 26, 29-30. Mr. Nassbridges did the trading in the accounts, either through online access or by calling the trading desks. Castellano Dep. at 12, 39; Lewis Dep. at 29-30; Texido Dep. at 20.

### d.  Mr. Nassbridges's Testimony

Mr. Nassbridges sat for two depositions. In his 2009 deposition, he testified that ABEX investors' funds were pooled together after investors wired money to ABEX. 2009 R. Nassbridges Dep. at 72, 138. Mr. Nassbridges testified that investor funds, including funds from the Murrays and Mr. Gindt, were invested with MF Global. *Id*. at 146. Mr. Nassbridges testified that "[i]n return, we purchased certain amount of gold and silver, that we never got from them yet." *Id*. at 146. Mr. Nassbridges testified that the investments were lost because MF Global failed to honor a stop-loss or stop-sell order. *Id*. at 146.

Mr. Nassbridges testified that he did not know that the MF Global accounts were being used to trade futures, that he was misled by MF Global employees who told him he could purchase gold bars and coins through the accounts, and that he believed the accounts were actually being used to purchase physical gold and silver. *Id*. at 170, 176, 193, 210, 211. Mr.

Nassbridges testified that neither he nor his ABEX employees discussed commodity futures and options with prospective investors. *Id*. at 102. He also testified that he did disclose to investors that their funds would be pooled with other investors' funds. *Id*. at 102. Mr. Nassbridges testified that ABEX did not provide clients with any statements from MF Global about the state of the accounts, because "it wasn't their problem." *Id*. at 226.

## II.    Legal Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is to be granted cautiously, with due respect for a party's right to have its factually grounded claims and defenses tried to a jury. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Celotex*, 477 U.S. at 323. When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact as to an essential element of its case. *See Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the burden shifts to the opposing party to set out specific material facts showing a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 248-49. A "material fact" is one which "might affect the outcome of the suit under the governing law . . . ." *Id.* at 248. A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *Id.* The court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F. Unified*

*Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001).  The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]."  *Liberty Lobby*, 477 U.S. at 252.

### III.   Failure to Disclose Exhibits

Mr. Nassbridges filed 773 pages of exhibits with the Court, which constitute "Exhibit F" to the Opposition.  These documents, however, were never provided to the CFTC.  *See* Reply at 6.  They are also not filed on the electronic docket.  *See* Dkts. 259, 260.  Although the Court finds that summary judgment as discussed below is appropriate even when considering the documents included in Exhibit F, the Court further rules that the exhibit is properly excluded under Rule 37(c).  *See* Fed. R. Civ. P. Rule 37(c) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial . . ."); *Jain v. TriMas Corp.*, CIV.S040889FCDPAN, 2005 WL 3439932, at *3 (E.D. Cal. Dec. 15, 2005) (excluding exhibits to late expert report because plaintiff did not previously disclose them to defendants).

Similarly, Mr. Nassbridges filed a supplemental expert report on July 11, 2014, three days before the initial hearing date.  *See* Defendant's Forensic Accountant Expert Second Report (Dkt. 268).  The CFTC moves to strike the report because it was filed late and after the close of discovery, in violation of Local Rule 7-9 and Federal Rule of Civil Procedure 26.  *See* Motion to Strike (Dkt. 269).  The motion is GRANTED.

### IV.   Admissions

The Court first addresses the CFTC's argument that all facts submitted to Mr. and Mrs. Nassbridges in the CFTC's Requests for Admission ("RFAs") in discovery are admitted because Mr. and Mrs. Nassbridges failed to respond.  It is true that neither Mr. or Mrs. Nassbridges responded to the CFTC's RFAs, which are attached to the Motion as exhibits A (RFAs to Mr. Nassbridges) and G (RFAs to Mrs. Nassbridges).  In discovery proceedings, the Magistrate Judge ruled that, "[a]s a result of the Nassbridges' failure to serve timely responses to the admission requests, each of the matters was automatically deemed admitted and shall remain

conclusively established unless the Court, on a motion, permits the admission to be withdrawn. See Fed. R. Civ. P. 36(b)." Order, December 6, 2013 (Dkt. 224), at 1. There has been no motion to withdraw the admissions, and the Magistrate Judge reaffirmed his decision after reviewing documents that Mr. and Mrs. Nassbridges presented as responses. *See* Order, January 7, 2014 (Dkt. 232). Defendants do not respond to this argument in the Opposition.

Therefore, the statements in the RFAs are deemed admitted and therefore "conclusively established." Fed. R. Civ. P. 36(b). Such facts are appropriate for consideration on a motion for summary judgment. *See Wright v. Paul Revere Life Ins. Co.*, 291 F. Supp. 2d 1104, 1111 (C.D. Cal. 2003).

## V.   Supplemental Bougas Declaration

The Court was concerned that the initial Declaration of CFTC Investigator Michelle Bougas did not fully authenticate all of the statements therein. The CFTC filed a supplemental brief and exhibits explaining and establishing foundation and admissibility of its contents. *See* Letter Brief (Dkt. 273). The citations to the Bougas Declaration in this order refer to the original declaration, but incorporate the relevant exhibits filed with the supplemental letter brief.

## VI.   Whether the ABEX Entities are Commodities Pool Operators

The Complaint alleges several counts of fraud and regulatory violations based on the ABEX entities qualifying as Commodities Pool Operators ("CPO") under the CEA. The Court therefore addresses this issue at the outset.

The CEA defines a commodity pool operator ("CPO") as:

any person—

**(i)** engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any—

(I) commodity for future delivery, security futures product, or swap;

> (II) agreement, contract, or transaction described in section 2(c)(2)(C)(i) of
>
> this title or section 2(c)(2)(D)(i) of this title;
>
> (III) commodity option authorized under section 6c of this title; or
>
> (IV) leverage transaction authorized under section 23 of this title; . . .

7 U.S.C. § 1a(11)(A).  Regulation 1.3(aa)(3), 17 C.F.R. 1.3(aa)(3), defines an "associated person" as:

> any natural person who is associated in any of the following capacities with: . . .
> (3) A commodity pool operator as a partner, officer, employee, consultant, or
> agent (or any natural person occupying a similar status or performing similar
> functions), in any capacity which involves (i) the solicitation of funds, securities,
> or property for a participation in a commodity pool or (ii) the supervision of any
> person or persons so engaged . . .

17 C.F.R. § 1.3(aa)(3).  The CFTC argues that ABEX Corp. and ABEX LLC acted as CPOs, and that Mr. Nassbridges acted as an associated person of those CPOs.

First, the Court addresses whether there is a material issue of fact as to whether ABEX Corp. and ABEX, LLC were CPOs.  To be a CPO, the ABEX entities must be a person "engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise," and who solicits funds, securities or property from others "in connection" with that business, "for the purpose of trading in commodity interests."  7 U.S.C. § 1a(11)(A).  A "person" for purposes of the statute "imports the plural or singular, and includes individuals, associations, partnerships, corporations, and trusts."  7 U.S.C. § 1a(38).

There is no genuine dispute of material fact that ABEX functioned as a CPO.  ABEX, through Mr. Nassbridges and Mr. Lund, solicited funds from individuals, placed those funds in trading accounts, and used the funds to invest in commodities futures and options.  Mr. Nassbridges argues in part that he did not know or did not intend to trade commodities futures and options; instead, he intended to actually buy and sell gold bullion using leverage accounts. Even if ABEX had only traded precious metals, ABEX LLC and ABEX Corp. would qualify as CPOs.  The "commodity interests" whose trading requires registration as a CPO include

"leverage transaction authorized under section 23 of this title."  7 U.S.C. 1a(11)(A)(i)(IV).

Section 23 of Title 7 is titled "Standardized Contracts for Certain Commodities," and

specifically addresses the purchase of precious metals.  Subpart (b) is specifically titled

"Permission to enter into contracts for delivery of silver or gold bullion, bulk silver or gold

coins, or platinum; rules and regulations."  7 U.S.C. § 23(b); *see also* 7 U.S.C. § 23(b)(1) ("no

person shall offer to enter into, enter into, or confirm the execution of, any transaction for the

delivery of silver bullion, gold bullion, bulk silver coins, bulk gold coins, or platinum . . .

contrary to the terms of any rule, regulation, or order that the Commission shall prescribe.").

Therefore, even if Mr. Nassbridges had invested the ABEX funds as he claimed, or claimed that

he intended, the ABEX entities would still qualify as CPOs.

Mr. Nassbridges points to Exhibits A and B to his Opposition as demonstrating a material

issue of fact on this point.  Each of these exhibits discusses whether ABEX's activities

constitute a commodities pool.  One is a letter from Mr. Nassbridges's bankruptcy counsel,

explaining that he attempted to negotiate a global settlement with creditors of the Nassbridges,

and that this "pool" of creditors should not be understood as "pooling" under the CEA.  *See*

Opp'n Ex. A.  The other is an expert report that analyzes the letter from bankruptcy counsel and

discusses an earlier expert report that is also submitted in a later Opposition exhibit.  The report

describes the ABEX "business model," and opines that this is not a commodity pool.

First, the letter regarding bankruptcy creditors raises no genuine issue of fact.  It simply

explains that any effort to pool creditors was not a commodities pool.  The CFTC is not alleging

that the effort to pool the bankruptcy creditors was a commodities pool.  It alleges that the act of

ABEX funneling investor money into commingled trading accounts and using those funds for

commodities trading constituted a commodities pool.  These facts are undisputedly true; Mr.

Nassbridges himself testified that all funds were pooled.  *See* 2009 R. Nassbridges Dep. at 72.

As noted above, even if these funds in the ABEX bank accounts had been used as ABEX

represented it would use them (to purchase bullion), this would also have constituted a

commodities pool.  Mr. Nassbridges therefore demonstrates no genuine issue of material fact as

to ABEX's operation as a CPO.  Second, the expert report analyzing ABEX's "business model"

simply discusses the model as described to the expert by the Defendants; it does not rebut any of the actual facts discussed above.

Having determined that the ABEX entities qualified as CPOs as a matter of law, the Court proceeds to evaluate the fraud and regulatory claims alleged by the CFTC.

## VII.   Counts 1-3: Fraud

### a.   Applicable Law

Counts 1-3 allege violations of the antifraud provisions of the CEA.  The CFTC claims that R. Nassbridges violated §§ 4b(a)(2)(A) and (C), 4c(b), and 4*o*(l) of the CEA, which correspond to 7 U.S.C. §§ 6b(a)(2)(A) and (C), 7 U.S.C. § 6c(b), 7 U.S.C. § 6*o*(1), and regulations 17 C.F.R. §§ 33.10(a) and (c), repealed June 26, 2012 (after the conduct alleged in this lawsuit).

The statutory provisions at issue are listed below.  First, section 6b(a) governs fraudulent representations regarding futures contracts:

(a) Unlawful actions

It shall be unlawful—

. . .

(2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market—

(A) to cheat or defraud or attempt to cheat or defraud the other person; [or]

. . .

(C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person[.]

7 U.S.C. § 6b(a)(2).  Similarly, section 6c(b) addresses fraud regarding options contracts:

(b) Regulated option trading

No person shall offer to enter into, enter into or confirm the execution of, any transaction involving any commodity regulated under this chapter which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty", contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe. . . .

7 U.S.C. § 6c.  In turn, 17 C.F.R. § 33.10 is one such regulation with which the covered transactions in § 6c must comply:

It shall be unlawful for any person directly or indirectly:

(a) To cheat or defraud or attempt to cheat or defraud any other person;

. . .

(c) To deceive or attempt to deceive any other person by any means whatsoever

in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction.

17 C.F.R. § 33.10.

In addition, section 6$o$(1) prohibits fraud through interstate commerce by a commodity advisor, commodity pool operator, or associated person of either:

(1) It shall be unlawful for a commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly

(A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or

-13-

(B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

7 U.S.C. § 6*o*(1).

The elements for each of these causes of action are essentially the same.  Options and futures fraud rely on the same set of elements, although options fraud technically involves two steps: section 6c(b) prohibits options transactions that violate any rule or regulation of the CFTC, and 17 C.F.R. § 33.10 is such a regulation that prohibits fraud in connection with a commodity option contract.  *See Commodity Futures Trading Comm'n v. Rosenberg*, 85 F. Supp. 2d 424, 445-46 (D.N.J. 2000).  Demonstrating liability for options fraud under § 33.10 includes proving the same elements as a claim for futures fraud under section 6b(a)(2): "(1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality."  *See Commodity Futures Trading Comm'n v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321, 1328 (11th Cir. 2002).

These elements are also the elements of proof for commodity pool operator fraud under 7 U.S.C. § 6*o*(1).  *See U.S. Commodity Futures Trading Comm'n v. Driver*, 877 F. Supp. 2d 968, 978 (C.D. Cal. 2012) ("The same intentional or reckless misappropriations, misrepresentations, and omissions of material fact violative of section 4b of the Act . . . also violate section 4*o*(1)(A)-(B) of the Act, 7 U.S.C. § 6*o*(1)(A)-(B)."); *Commodity Futures Trading Comm'n v. Weinberg*, 287 F. Supp. 2d 1100, 1108 (C.D. Cal. 2003) ("The same conduct by Weinberg that violates Section 4b(a)(i) and (iii) also violates Section 4*o* (1).").  Fraud as a commodity pool operator, however, does not require scienter.  *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 285 (9th Cir. 1979) ("[W]e hold that an action for injunctive relief by the CFTC under section 4*o* (1) requires only that the violator have acted intentionally. That is, he must have intended to employ the 'device, scheme, or artifice' but it is not necessary that he know that its result will be to defraud the client or prospective client.").

### b.  Collateral Estoppel

#### i.  Background

The CFTC argues that the bankruptcy court's judgment in favor of the Murrays against Mr. Nassbridges has preclusive effect and establishes the fraud elements in this case.  The CFTC asserts a theory of offensive non-mutual collateral estoppel.  Mot. at 14.  "Offensive non-mutual collateral estoppel is a version of the doctrine that arises when a plaintiff seeks to estop a defendant from relitigating an issue which the defendant previously litigated and lost against another plaintiff."  *Appling v. State Farm Mut. Auto. Ins. Co.*, 340 F.3d 769, 775 (9th Cir. 2003). The Court applies offensive non-mutual collateral estoppel when: "(1) there was a full and fair opportunity to litigate the identical issue in the prior action; (2) the issue was actually litigated in the prior action; (3) the issue was decided in a final judgment; and (4) the party against whom [collateral estoppel] is asserted was a party or in privity with a party in the prior action." *Syverson v. IBM,* 472 F.3d 1072, 1078 (9th Cir. 2007).

Whether to apply the doctrine is within the discretion of the district court and is reviewed for an abuse of that discretion.  *Appling*, 340 F.3d at 775.  This discretion "provides those courts the authority to take potential shortcomings or indices of unfairness into account when considering whether to apply offensive nonmutual issue preclusion, even where the above-listed standard prerequisites are met."  *Syverson*, 472 F.3d at 1078-79.  The factors the Court should consider in determining whether it is fair to apply the doctrine include:

(1) "the plaintiff had the incentive to adopt a 'wait and see' attitude in the hope that the first action by another plaintiff would result in a favorable judgment" which might then be used against the losing defendant; (2) the defendant had the incentive to defend the first suit with full vigor, especially when future suits are not foreseeable; (3) one or more judgments entered before the one invoked as preclusive are inconsistent with the latter or each other, suggesting that reliance on a single adverse judgment would be unfair; and, (4) the defendant might be afforded procedural opportunities in the later action that were unavailable in the first "and that could readily cause a different result."

*Id*. at 1079 (quoting *Parklane Hosiery*, 439 U.S. at 330-31).

The prior proceeding at issue is part of the Nassbridges' bankruptcy.  A bankruptcy judgment has preclusive effect in later proceedings if the requirements for estoppel are met. *Katchen v. Landy*, 382 U.S. 323, 334 (1966) ("The normal rules of res judicata and collateral estoppel apply to the decisions of bankruptcy courts.").  The Murrays brought an adversary proceeding in the bankruptcy to render the debt owed them nondischargeable on the basis of fraud under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6).  *See In re Nassbridges*, 434 B.R. 573, 576 (Bankr. C.D. Cal. 2010) *aff'd,* 464 B.R. 494 (B.A.P. 9th Cir. 2011).  The bankruptcy court conducted a bench trial, heard testimony, and accepted declarations.  *Id.*  The court then issued a Statement of Decision finding actual fraud under § 523(a)(2)(A).  The Statement of Decision includes a long discussion of the facts for the same time period at issue here: September 2007 through March 2008.  *Id.* at 576-81.  The court held that the Murrays had proven the following elements: "(a) the debtor made a misrepresentation or fraudulent omission, or engaged in deceptive conduct; (b) at the time of the representation or conduct described in (a) the debtor knew it to be false or deceptive; (c) the debtor made the representation with the intent and purpose of deceiving the plaintiff(s); the plaintiff(s) justifiably relied on the representation; and (e) the plaintiff(s) sustained a loss or damage as the proximate consequence of the representation having been made."  *Id.* at 584.

In finding fraud, the court made the following explicit findings:

(1) debtor either stated falsely to the Murrays that the Murrays' money was going to be used to buy gold bullion, or failed to disclose that their monies were actually being sent to MF Global to invest in a highly leveraged and risky futures or forward contracts margin account. This was very material information concerning the degree of risk inherent in the transaction;

(2) debtor knew at the time he made this statement that it was false or deceptive and/or that the information not disclosed was highly material and that the ABEX materials given the Murrays were therefore very deceptive;

(3) debtor made these statements, or failed to inform the Murrays, with intent that they be deceived since the Murrays never would have agreed to this level of risk as the debtor well knew;

(4) the Murrays reasonably relied upon these statements or reasonably relied upon the ABEX brochures and sales scripts, etc., in believing they were buying gold bullion; and

(5) the Murrays were proximately damaged by these misstatements or failures to disclose in that their entire net investment was wiped out, in the amount of $1,546,523.

*Id*. at 587.  The Bankruptcy Appellate Panel affirmed the bankruptcy court's findings:

The bankruptcy court found that Murrays, based on their conversations with Nassbridges, the ABEX brochures, the monthly ABEX statements, and the script read by ABEX employees after each trade, all of which made reference to gold bullion, thought they were buying gold bullion; Murrays had no idea Nassbridges/ABEX was investing their monies in risky futures contracts because he failed to disclose that material fact. . . . [W]e see nothing in the record to suggest that the bankruptcy court's findings of fact with respect to Murrays's claim under section 523(a)(2)(A) are illogical, implausible, or without support in the record.

*In re Nassbridges*, 464 B.R. 494, at *12 (B.A.P. 9th Cir. 2011).

## ii.  Discussion

### 1.  Similarity

In deciding whether the issues litigated in two proceedings are the same, the Court considers the following factors:

(1) is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first?

(2) does the new evidence or argument involve the application of the same rule of law as that involved in the prior proceeding?

(3) could pretrial preparation and discovery related to the matter presented in the first action reasonably be expected to have embraced the matter sought to be presented in the second?

(4) how closely related are the claims involved in the two proceedings?

*Steen v. John Hancock Mut. Life Ins. Co.*, 106 F.3d 904, 912 (9th Cir. 1997).  The similarity requirement is unquestionably met in this case.  The evidence presented to the bankruptcy court is nearly identical.  The Murrays submitted their own declarations and testified to the same facts to which they have testified in this case.  *See Nassbridges I*, 343 B.R. at 576.  The same brochures and mailings were filed before the Court, Mr. Lund provided the same testimony as is evident in his deposition in this case, and Mr. Nassbridges filed a declaration.  *Id*. at 578-79. The same account documents from the Murrays' ABEX accounts were admitted before the bankruptcy court.  *Id*. at 579.  Documents filed by Mr. Nassbridges in his exhibits state that the bankruptcy case included over 100 exhibits and the testimony of five witnesses.  *See* Opp'n Ex. 5.  The conduct underlying both actions is the same, and the evidence significantly overlaps.

Mr. Nassbridges makes some argument in his opposition that he was unable to present evidence of MF Global's fraud at the bankruptcy proceeding.  *See* Opp'n at 5.  The argument appears to be that Mr. Nassbridges did not realize that MF Global was not actually buying gold bullion with the money in the trading accounts until he was notified of the MF Global bankruptcy.  The exhibits Mr. Nassbridges provides in support of this allegation, however, show that at least some of the evidence of Mr. Nassbridges's alleged intent was provided at least four months before the bankrupty trial.  *See* Opp'n Ex. 6 (Ex. C to document).  It is also not explained why Mr. Nassbridges needed to know that MF Global had declared bankruptcy in order to realize that MF Global lied to him about what type of account he had or what had happened to the funds in it—the fact that futures were being traded became apparent as soon as the accounts were sapped by market fluctuation in March 2008.  Mr. Nassbridges provides no supporting explanation.  There is no indication to the Court that there was any evidence unavailable at the time of the bankruptcy that should prevent collateral estoppel now.

The present proceeding also involves the same essential rule of law.  The commodities fraud violations require fewer elements than fraud under 11 U.S.C. § 523, as they do not require reliance or causation.  The elements determined by the bankruptcy court therefore fully encompass the required elements of all of the CEA violations alleged here: misrepresentation, scienter, and materiality.  *See R.J. Fitzgerald & Co.*, 310 F.3d at 1328.  The bankruptcy court determined these elements clearly and unequivocally: "In sum, the court finds that: (1) debtor either stated falsely to the Murrays that the Murrays' money was going to be used to buy gold bullion, or failed to disclose that their monies were actually being sent to MF Global . . . .  This was very material information concerning the degree of risk inherent in the transaction; (2) debtor knew at the time he made this statement that it was false or deceptive and/or that the information not disclosed was highly material and that the ABEX materials given the Murrays were therefore very deceptive; (3) debtor made these statements, or failed to inform the Murrays, *with intent that they be deceived* since the Murrays never would have agreed to this level of risk as the debtor well knew."  *Nassbridges I*, 434 B.R. at 587.  Both cases address the same facts used to prove the same elements.

Similarly, pretrial preparation and discovery for each of these cases would have been the same, focused on ABEX's activities, disclosures, and Mr. Nassbridges's intent.  There is no material difference between the two actions on this point.  Because the claims are nearly identical and premised on the same actions by Mr. Nassbridges, the two cases are also very closely related.

The Court therefore finds that the first collateral estoppel element is satisfied.

### 2.  Actually Litigated

It is also clear that the fraud issue was actually litigated and determined in the bankruptcy action.  Indeed, fraud was the sole issue in the bankruptcy action, and the bankruptcy court made specific findings that Mr. Nassbridges defrauded the Murrays.  *Id.*  As discussed above, the bankruptcy court made specific findings on the necessary elements of the fraud claims.  There was a full bench trial, far more than the summary judgment or motion for judgment on the

pleadings that would also satisfy this element.  *See Steen v. John Hancock Mut. Life Ins. Co.*, 106 F.3d 904, 912 (9th Cir. 1997).  This element is therefore satisfied.

### 3.  Necessarily Decided

"Preclusive force attaches to determinations that were necessary to support the court's judgment in the first action."  *Resolution Trust Corp. v. Keating*, 186 F.3d 1110, 1115 (9th Cir. 1999).  Because the bankruptcy court had to find misrepresentation, scienter, and materiality in order to enter judgment against Mr. Nassbridges, these issues were certainly necessarily decided in that action.  They were in no way "peripheral" to the bankruptcy court findings.  *See id*.  This element is therefore satisfied.

### 4.  Same Party

Mr. Nassbridges was the debtor in the bankruptcy action.  *See Nassbridges I*, 434 B.R. at 577.  He is also a defendant named in this case, and the subject of the instant motion for summary judgment.  As such, it is appropriate to apply collateral estoppel against him.

### 5.  Fairness Factors

The Court finds that the fairness factors described in *Parklane* weigh in favor of collateral estoppel in this case.  There was no reason for Mr. Nassbridges to avoid vigorously litigating this issue in the bankruptcy court, as it was in his interest to avoid a $1.5 million dollar nondischargeable judgment.  This was a significant incentive.  It was not unforeseeable that there may be regulatory action; Mr. Nassbridges's attorney's letters show that he was aware of the NFA, and he submits himself significant NFA documents regarding trader noncompliance.  There were also no procedural differences between this suit and the bankruptcy suit; Mr. Nassbridges had every opportunity to present evidence, cross examine, and argue to the bankruptcy court.  He participated in a full bench trial.

There are also no earlier inconsistent judgments weighing against collateral estoppel. The Murrays did file a civil complaint in district court, but they dropped the fraud allegations by a stipulated amended complaint and ultimately obtained a judgment on negligence.  *See Nassbridges I*, 434 B.R. at 581-82.  They had to prove separately in the bankruptcy court that the actions were fraudulent in order to prevent discharge through the bankruptcy.  Had the

Murrays failed to prove fraud in the district court, this might be a factor weighing against application of collateral estoppel.  *See Syverson*, 472 F.3d at 1079 (discussing inconsistent judgments).  This is not the case, however.

To the extent that Mr. Nassbridges alleges that he was pro se in the bankruptcy proceeding, this is false; his own exhibits demonstrate that he had counsel.  *See Nassbridges I*, 434 B.R. at 576; Opp'n Ex. 6.

### 6.  Conclusion

Based on the foregoing, the issue of liability for commodities fraud was fully litigated and determined against Mr. Nassbridges in the bankruptcy court.  He therefore cannot relitigate the issue in this court.

### c.  No Remaining Dispute of Fact

There is no remaining dispute of material fact as to the alleged violations of the CEA. The bankruptcy court fully litigated the relevant elements and determined them against Mr. Nassbridges.  Although the Court struggles at times to interpret Mr. Nassbridges's filings, the Court is unable to identify any discernible issue left for trial.  There can be no dispute that the misrepresentations and omissions found by the bankruptcy court were related to sales of futures and options, nor any dispute that the Murrays' experience was different than that of any other victim.  *See* 2014 R. Nassbridges Dep. at 187 ("Q: Would it be fair to say that the Murrays weren't treated any differently than any other customer? A: Absolutely.").  Even if it were not, defrauding the Murrays alone would be sufficient to establish liability under the CEA.

Mr. Nassbridges presents several arguments and exhibits that he claims show that he did not defraud his investors.  This includes expert opinion analysis opining that the bankruptcy trustee did not find any irregularities, and that only one investor filed a fraud claim in the bankruptcy court.  *See* Opp'n Ex. A, B.  Mr. Nassbridges also argues that his personal accounting records dispute various aspects of the fraud claims.  Opp'n at 7.  Mr. Nassbridges also argues that the true fraud was perpetrated by MF Global, and submits a number of exhibits detailing misconduct at MF Global.  *See id*. at 8, Exs. 6, 8.  Mr. Nassbridges also argues that the CFTC is ignoring evidence that MF Global lied to *him* by telling him his accounts were, in fact,

for delivery of gold bullion.  *See id.* at 12, Ex. 6.  These issues do not go to the fact of collateral estoppel, however, and Mr. Nassbridges is estopped from relitigating these issues in this Court.

## VIII.   Count 4: Failure to Register

### a.   Applicable Law

Section 4k(2) of the CEA, 7 U.S.C. § 6k(2), provides:

> (2) It shall be unlawful for any person to be associated with a commodity pool operator as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool . . . unless such person is registered with the Commission under this chapter as an associated person of such commodity pool operator and such registration shall not have expired, been suspended (and the period of suspension has not expired), or been revoked. . . .

7 U.S.C. § 6k(2).  Regulation 1.3(aa)(3), 17 C.F.R. 1.3(aa)(3), defines an "associated person" as:

> any natural person who is associated in any of the following capacities with: . . .
>
> (3) A commodity pool operator as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged . . .

17 C.F.R. § 1.3(aa)(3).

### b.   Discussion

The CFTC argues that ABEX Corp. and ABEX LLC acted as CPOs, and that Mr. Nassbridges acted as an associated person of that CPO.  Therefore, the CFTC argues that Mr. Nassbridges's acts in soliciting funds from investors like the Murrays and Mr. Gindt, pooling those funds in MF Global trading accounts, and then trading those funds in futures and options constituted soliciting funds for a commodity pool under § 6k(2), and so required registration as an "associated person."  Mot. at 20.

The Court has already determined that there is no genuine dispute that the ABEX entities were CPOs. The Court therefore turns to whether there can be any genuine dispute that Mr. Nassbridges was an "associated person" requiring registration. No genuine dispute on this issue is possible. Mr. Nassbridges was the CEO and president of ABEX Corp. and the CEO of ABEX LLC. *See* 2009 R. Nassbridges Dep. Ex. 31 (ABEX Corp. filings with the California Secretary of State listing Ryan A. Nassbridges as CEO, as well as account documents listing Ryan A. Nassbridges as President); B. Nassbridges Dep. at 44 (stating that Ryan Nassbridges was "president" of "American Bullion Exchange, LLC"). Mr. Nassbridges was certainly a "partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions)." 7 U.S.C. § 6k(2); 17 C.F.R. § 1.3(aa)(3). The CFTC has also submitted evidence showing that Mr. Nassbridges solicited funds from Mr. Gindt and the Murrays on behalf of ABEX, supervised Mr. Lund's solicitation of funds on behalf of ABEX, and oversaw all of ABEX's marketing materials and policies. *See* Gindt Dep. at 6-7; Murray Dep. at 11-12; Lund Dep. at 15-20. Mr. Nassbridges has not presented any evidence materially disputing that he solicited funds or provided the advertising materials at issue. Mr. Nassbridges discussed customer disclosures in his own deposition. *See* 2009 R. Nassbridges Dep. at 102. Mr. Nassbridges has therefore not met his burden to show any genuine dispute of fact as to whether he was obligated to register as an "associated person" based on his work for the ABEX entities.

Next, the Court addresses the question whether Mr. Nassbridges was registered with the CFTC. The CFTC submits both the Bougas Declaration and Mr. Nassbridges's admissions. The CFTC's RFA ¶ 3 to Ryan Nassbridges reads: "Admit that R. Nassbridges was never registered with the Commission in any capacity." *See* Mot. Ex. A. The CFTC has therefore satisfied its burden. Mr. Nassbridges does not present any evidence that he was registered with the CFTC between October 2006 and March 2008. Therefore, there is no genuine dispute of material fact that Mr. Nassbridges was required to register under 7 U.S.C. § 6k(2).

In its initial complaint, the CFTC also alleged that Mr. Nassbridges violated 7 U.S.C. § 6m(1), relating to the use of instrumentalities of interstate commerce by commodity trading

advisors and CPOs.  The CFTC did not raise this allegation in its motion for summary judgment. That claim will therefore proceed to trial.

## IX.     Counts 5-7: Pool Funds, Pool Disclosure Documents, Monthly Account Statements

The remaining counts in the Complaint address the Defendants' failure to treat the commodity pool funds as a separate entity, failure to accept pool funds only in the name of the pool, failure to provide pool disclosure documents, and failure to provide monthly account statements.

The CFTC makes no argument on these counts in its motion.  The only part of the motion that could be construed to reference these claims is the CFTC's brief argument that Mr. and Mrs. Nassbridges' failure to respond to the RFAs caused them to admit all of the material facts alleged in the complaint.  *See* Mot. at 20.  The CFTC argues that it is therefore "entitled to summary judgment on all of the claims in its Complaint."  *Id*.  The CFTC does not indicate which RFAs support its claims, does not reference the regulations or code sections that it alleges Mr. Nassbridges violated, and does not reference sections of its Complaint that correspond to these counts.  The Court reviewed the RFAs the CFTC submitted to Mr. and Mrs. Nassbridges, *see* Mot. Exs. A, G, and it does not appear to the Court that all of the elements of the alleged regulatory violations are established by the RFAs.

Federal Rule of Civil Procedure 56 states the following procedures that a party must follow in moving for summary judgment:

(c) Procedures.

(1) *Supporting Factual Positions*. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c).  Should the Court find that a party has failed to meet the requirements of Rule 56(c), the Court has several options under Rule 56(e):

(e) Failing to Properly Support or Address a Fact. If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials-- including the facts considered undisputed--show that the movant is entitled to it; or

(4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).  The Court finds that the CFTC's wholesale failure to mention, discuss, or analyze its regulatory allegations in Counts 5-7 of its Complaint places it in noncompliance with Rule 56(c).  The Court therefore DENIES summary judgment on the regulatory violations alleged in Counts 5-7.

## X.    Additional Arguments in Opposition

Mr. Nassbridges raises numerous arguments in opposition to the motion that are not fully briefed, many of which do not cite legal authority.  The Court has evaluated and considered each argument, but does not address them all individually here.  To the extent they are not discussed, they are found to be unconvincing.  The Court addresses several of Mr. Nassbridges's more detailed arguments here.

Mr. Nassbridges argues that deposition transcripts cannot be relied on at summary judgment, but this is inaccurate.  *See* Fed. R. Civ. P. 56(c) (permitting a moving party to support an assertion using "particular parts of materials in the record, including depositions . . .").

Mr. Nassbridges also argues that Title 7 of the United States Code is not applicable here because it applies only to agriculture, rather than the dealing of coins and bullion. Title 7 does bear the title "Agriculture," but it also covers all commodities markets and trading, including precious metals. *See, e.g.,* 7 U.S.C § 23.

Mr. Nassbridges also argues that this action violates his bankruptcy discharge injunction under 11 U.S.C. §§ 727 and 524(a)(2). Opp'n at 17. The Court previously rejected this argument in an earlier order and sees no reason to do otherwise at this time. *See* Order, March 11, 2011 (Dkt. 22) at 5-6.

Mr. Nassbridges also argues that the CFTC cannot move for summary judgment because its motion is untimely and because the Court previously denied Mr. Nassbridges' smotion for summary judgment on October 17, 2013. *See* Order (Dkt. 217). Mr. Nassbridges claims that the order "promises" that Mr. Nassbridges will proceed to trial. Opp'n at 16. First, the CFTC's motion is not barred as untimely. It is proper under the Court's most recent scheduling order, in force as of January 27, 2014. *See* Minutes (Dkt. 241). Second, the fact that the Court denied the Defendants' motion does not automatically mean that the Plaintiff's motion must be denied.

## XI.   Remedies

Although several causes of action remain outstanding, the fraud claims are the basis for the requested remedies. The Court therefore disposes of the remedies for the fraud violations at this time.

### a.  Injunctive Relief

The CFTC seeks a permanent injunction against all of the Defendants under section 6c(a) of the CEA, 7 U.S.C. § 13a-1(a). This statutory provision gives the CFTC authority to seek injunctive relief "whenever it appears that any person 'has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this Act or any rule, regulation, or order thereunder.' Section 6c further provides that upon a proper showing, a permanent or temporary injunction or restraining order shall be granted by the district court without bond." *Commodity Futures Trading Comm'n v. Hunt*, 591 F.2d 1211, 1219 (7th Cir. 1979). "Once a violation is demonstrated, the moving party need show only that there is some

reasonable likelihood of future violations." *Id*. at 1220.  In determining whether to grant such an injunction, the Court considers: "the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations." *U.S. S.E.C. v. Ginsburg*, 362 F.3d 1292, 1304 (11th Cir. 2004) (internal citation omitted).  Courts have entered permanent injunctions against future violations of the CEA.  *See, e.g., CFTC v. U.S. Metals Depository Co.,* 468 F. Supp. 1149 (S.D.N.Y.1979).  "Broader injunctions prohibiting trading activity, in addition to enjoining defendants from future violations, may also be warranted." *U.S. Commodity Futures Trading Comm'n v. Arrington*, 8:11CV181, 2014 WL 685331, at *21 (D. Neb. Jan. 28, 2014), motion for relief from judgment denied (Apr. 16, 2014).

In support of its request for a permanent trading injunction, the CFTC argues that Mr. Nassbridges's violations were willful, flagrant, and involved scienter.  They argue that he has made no promises not to repeat these mistakes, and that failure to enjoin might result in more victims.  The Court agrees that Mr. Nassbridges's conduct is sufficiently serious, long-term, and willful to establish a reasonable likelihood of a future violation.  Courts considering similar cases have imposed permanent trading bans on persons found in violation of the fraud provisions of the CEA.  *See id*.

The Court therefore enters a comprehensive trading ban against Mr. Nassbridges, and enters a permanent injunction restraining him and any of his agents, servants, employees, assigns, attorneys, and persons in active concert or participation with them, from violating the CEA and from engaging in future trading.

### b.  Monetary Penalties

The CFTC also requests civil monetary penalties under section 6c(d)(1) of the CEA, 7 U.S.C. § 13a-1(d)(1), and Regulation 143.8(a), 17 C.F.R. § 143.8(a)(2).  These sections provide in relevant part:

(d) Civil penalties

(1) In general

In any action brought under this section, the Commission may seek and the court shall have jurisdiction to impose, on a proper showing, on any person found in the action to have committed any violation—

(A) a civil penalty in the amount of not more than the greater of $100,000 or triple the monetary gain to the person for each violation . . .

7 U.S.C. § 13a-1(d)(1). The associated regulation, 17 C.F.R. 143.8, increased the base penalty to $130,000 for violations committed between October 23, 2004 and October 23, 2008. 17 C.F.R. 143.8(1)(ii)(C).

The CFTC identifies the following factors for consideration in determining monetary penalties: "the relationship of the violation at issue to the regulatory purposes of the CEA and whether or not the violations involved core provisions of the CEA; whether scienter was involved; the consequences flowing from the violations; financial benefits to a defendant; and harm to customers or the market." *Arrington*, 2014 WL 685331, at *22. Findings of fraud are especially serious and deserving of monetary penalties. *See Driver*, 877 F. Supp. 2d at 982.

The CFTC argues that Defendants received approximately $5.5 million from participants, earned about $300,000 through actual spot trading of metals, and returned about $870,000 to participants. Mot. at 24. The CFTC calculates from this a monetary gain of $4,930,000, which it requests be tripled to a penalty of $14,790,000. The Court finds persuasive the fact that Mr. Nassbridges intentionally misrepresented or omitted crucial information to investors like the Murrays and Mr. Gindt. His actions caused significant harm and go to the heart of the purposes of the CEA. In calculating a penalty, the Court finds that the total value of the investments solicited, $5.5 million, is the preferred base point. This amount should be reduced, however, to reflect the money distributed to investors and the amount of the outstanding $1.5 million judgment held by the Murrays, for which Mr. Nassbridges remains liable. The Court therefore assesses a monetary penalty of $3,430,000.00 against Mr. Nassbridges.

**c.  Disgorgement**

Under 7 U.S.C. § 13a-1(d)(3)(B), the Court may also impose the equitable remedy of "disgorgement of gains received in connection with" a violation.  The statute provides:

(d) Civil penalties

. . .

(3) Equitable remedies

In any action brought under this section, the Commission may seek, and the court may impose, on a proper showing, on any person found in the action to have committed any violation, equitable remedies including—

(A) restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses); and

(B) disgorgement of gains received in connection with such violation.

7 U.S.C. § 13a-1 (d); *see Commodity Futures Trading Comm'n v. Co Petro Mktg. Grp., Inc.*, 680 F.2d 573, 583 (9th Cir. 1982).

The CFTC argues that Mr. and Mrs. Nassbridges transferred $1,643,787 of participant funds into their joint bank account, and then used those funds for personal expenses.  The CFTC asks that half that amount, or Bita Nassbridges's share, be disgorged as the product of the illegal activities.  Several RFAs support the argument that Defendants transferred funds to personal accounts.  *See* B. Nassbridges RFA No. 12; R. Nassbridges RFA No. 51 ("Admit that Defendants and/or Relief Defendants withdrew funds from trading accounts in their name and deposited those funds in R&B Nassbridges' joint bank accounts."); R. Nassbridges RFA No. 52 ("Admit that Defendants used customer funds to pay utilities, property taxes and insurance and to make political contributions.").  The Bougas Declaration supports the monetary calculation with explanation of the Nassbridges' bank accounts, underlying bank records, a summary table of those accounts, and explanation of the transactions between the ABEX accounts and the Nassbridges' personal accounts.  *See* Bougas Decl. ¶¶ 4-11, 34-47, Exs. 2-3; Letter Brief Exs. A, D-P, W-Z, AA-FF.

Based on the foregoing, the Court finds that disgorgement in the amount of $821,893 from Relief Defendant Bita Nassbridges is warranted.

### XII.   Default Judgment

The CFTC also moves for default judgment as to the nonresponding corporate defendants.  The Court resolves this motion in a separate order.

### IV.   Disposition

The Court GRANTS summary judgment as to counts 1-4 of the Complaint.  As to counts 5-8, summary judgment is DENIED.  The CFTC may submit a proposed final judgment for the Court's approval within one week of the resolution of the outstanding claims.

DATED:       August 7, 2014

_____
DAVID O. CARTER
UNITED STATES DISTRICT JUDGE